## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| DR. MINI RAJAN ABRAHAM | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HCA HEALTHCARE, INC. | ) | JURY TRIAL DEMANDED |
| | ) | |
| And | ) | |
| | ) | |
| MIDAMERICA DIVISION, INC. | ) | |
| | ) | |
| And | ) | |
| | ) | |
| OVERLAND PARK MEDICAL | ) | |
| SPECIALISTS, LLC | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S COMPLAINT

Plaintiff, Dr. Mini Rajan Abraham ("Dr. Abraham"), states and alleges the following against defendants HCA Healthcare, Inc., MidAmerica Division, Inc., and Overland Park Medical Specialists, LLC.

### NATURE OF THE COMPLAINT

1.      This is an action for legal and equitable relief brought under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, the Kansas Act Against Discrimination ("KAAD"), K.S.A. §§ 44-1001 *et seq.*, the Kansas Age Discrimination in Employment Act ("KADEA"), K.S.A. §§ 44-1111 *et seq.*, 42 U.S.C. § 1981, and the Kansas common law.

1

2.      Dr. Abraham was constructively discharged because of her sex, race, national origin, age, and for making complaints about Defendants' failure to provide her with adequate levels of clinical staff to safely treat patients—even after Dr. Abraham made numerous documented complaints related to the same.

3.      Defendants' unlawful conduct deprived Dr. Abraham of her employment and violated the terms of her employment agreement, resulting in the significant loss of financial compensation and other benefits that she would have earned and been entitled to but for the discrimination and retaliation alleged in this complaint.

## PARTIES

4.      Dr. Abraham is a 57-year-old woman of Indian descent residing in the State of Kansas.

5.      Defendant HCA Healthcare, Inc. ("HCA") is a Delaware corporation with its principal place of business at 1 Park Plaza, Nashville, Tennessee 37203-6527. It can be served with process at the office of its registered agent 300 Montvue Rd., Knoxville, Tennessee 37919–5546, or at its Division office located at 5440 W. 110th St., Leawood, KS 66211. HCA is a publicly traded company that owns and operates approximately 182 hospitals and over 2,300 medical facilities. HCA owns and operates its hospitals and medical facilities through its affiliates, which are direct or indirect subsidiaries of HCA. HCA controls and oversees its affiliates and subsidiaries, including, but not limited to, Defendant Overland Park Medical Specialists, LLC.

6.      Defendant MidAmerica Division, Inc. (doing business as "HCA Midwest Health") is a Kansas corporation with its principal place of business at 1 Park Plaza, Nashville, Tennessee 37203-6527. It can be served with process at the office of its registered agent: 112 SW 7th Street, Suite 3C, Topeka, KS 66603. HCA Midwest Health is a direct subsidiary of HCA and oversees

2

the operations of HCA's hospitals and facilities located in the Kansas City area. HCA Midwest

Health is a division of HCA, and Defendant Overland Park Medical Specialists, LLC is part of and

run by HCA Midwest Health.

7.      Defendant Overland Park Medical Specialists, LLC (doing business as "Overland

Park Endocrine and Diabetes Center" or "OPEDC") is a Kansas limited liability company located

at 10600 Quivira, 3rd Floor, Overland Park, KS 66215. It can be served with process at the office

of its registered agent: 112 SW 7th Street, Suite 3C, Topeka, KS 66603.

8.      At all relevant times, Defendants employed more than five hundred employees.

9.      Defendants HCA Healthcare, Inc., MidAmerica Division, Inc., and Overland Park

Medical Specialists, LLC (collectively "Defendants") share common management, have common

ownership and financial control, have interrelated operations, and a centralized control of labor

relations. Further, they constitute among other things, a "single employer" or "joint employer"

under Title VII, the KAAD, the ADEA, and the KADEA.

10.     HCA and HCA Midwest Health promulgate all rules and regulations pertaining to

the operations of its subsidiary and affiliate medical providers, including OPEDC.

11.     HCA and HCA Midwest Health promulgate and oversee the billing practices of its

subsidiary and affiliate companies providing medical services to patients, including OPEDC.

12.     Defendants HCA and HCA Midwest Health act directly in the interests of OPEDC

and were actively involved in the discriminatory conduct alleged herein.

13.     Defendants HCA and HCA Midwest Health were responsible for establishing and

training employees of OPEDC, investigating complaints, and disciplining employees of OPEDC.

14.     Defendants share employees, policies and procedures, and business records are

assessable between the organizations.

3

15.     Defendants HCA and HCA Midwest Health provide human resources policies to employees of OPEDC.

16.     Defendants jointly exercised significant control over Dr. Abraham and other OPEDC employees.

17.     Defendants are individually and collectively authorized to do business in Kansas. They are an "employer" as defined by Title VII, the ADEA, the KAAD, and the KADEA.

18.     Dr. Abraham was employed by Defendants at the Overland Park Endocrine and Diabetes Center and worked at its office at 10600 Quivira, 3rd Floor, Overland Park, KS 66215.

**JURISDICTION AND VENUE**

19.     Dr. Abraham submits to the jurisdiction of this Court for the adjudication of the claims alleged herein.

20.     Defendants are generally subject to personal jurisdiction in this Court because they conduct ongoing, substantial, and continuous business in Kansas.

21.     This Court has original subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, because several of Dr. Abraham's claims arise under federal law.

22.     This Court has supplemental jurisdiction over Dr. Abraham's state law claims under 28 U.S.C. § 1367, because those claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more of the Defendants reside within the geographical area known as the District of Kansas. Further, the events that gave rise to the causes of action alleged in this Complaint occurred in this District.

## ADMINISTRATIVE PROCEDURES

24.     On May 20, 2021, Dr. Abraham filed charges of discrimination against Defendants

with the Equal Employment Opportunity Commission, Charge Nos. 563-2021-01829, 563-2021-

01832, and 563-2021-01833, each of which was dual-filed with the Kansas Human Rights

Commission. *See* Exhibits 1–3, attached and incorporated as if fully set forth herein.

25.     On or around November 30, 2022, the EEOC issued Dr. Abraham a Notice of Right

to Sue. *See* Exhibits 4–6, attached and incorporated as if fully set forth herein.

26.     This lawsuit was filed within ninety (90) days of the issuance of the EEOC's Notice

of Right to Sue letters.

27.     Dr. Abraham has satisfied all private administrative and judicial prerequisites to the

institution of this lawsuit.

## FACTUAL SUPPORT

### *Defendants Hire Dr. Abraham and Dr. Gebremedhin*

28.     In or around 2009, Defendants hired Dr. Abraham to work as a physician at the

Overland Park Endocrine and Diabetes Center.

29.     In or around 2010, Defendants hired Dr. Gebremedhin ("Dr. G") to work as a

physician at the Overland Park Endocrine and Diabetes Center.

### *Dr. Abraham's Employment Agreement*

30.     In November 2019, Dr. Abraham executed a new employment agreement with

OPEDC.

31.     Section 3 of the Employment Agreement provides that:

Physician shall comply with Employer's policies and procedures applicable to
Physician to which Physician has reasonable access. Notwithstanding the
foregoing, nothing in this Agreement is intended to dictate how Physician practices
medicine or infringe upon Physician's professional judgment. Physician will be

able to treat patients in a manner Physician believes, in Physician's reasonable professional judgment, is in the patient's best interests.

32.     Section 10.B of the Employment Agreement details nine conditions that would allow Defendants to immediately terminate Dr. Abraham's employment. None of those conditions applied to Dr. Abraham at any point during her employment.

33.     Section 11.E of the Employment Agreement provides that: "The Parties will attempt to resolve any disagreements [arising out of or related to this Agreement or Physician's employment] through discussions with each other . . . [for a period of] 30 days . . ."

34.     At all times material, Dr. Abraham performed or stood ready to perform all of her obligations under her Employment Agreement, and her practice was always profitable and at or near full capacity.

### *Defendants Hire Jeff Benson as Market Manager*

35.     In or around March 2020, Defendants hired Jeff Benson ("Benson"), a white male, as the Market Manager for the Kansas City area.

36.     Shortly thereafter, Benson began imposing conditions on OPEDC that he did not impose on practices led by younger white male physicians. For example, Benson insisted that OPEDC's long-time Practice Manager, Alyson Gumminger, should take on the additional duty of serving as the Practice Manager for the Kansas City Women's Clinic without any additional compensation.

37.     As a result of this behavior, Ms. Gumminger resigned, feeling intimidated by Benson.

38.     Having successfully persuaded Ms. Gumminger to quit, Benson then suggested that OPEDC replace her with his friend Scott Risinger, a white male, who Benson referred to as a "dummy candidate" that was guaranteed the job.

39.     This was an attempt to circumvent Defendants' hiring process and secure a job for a candidate that was not well-qualified or suited for the position.

40.     Upon information and belief, Benson did not attempt to circumvent the hiring process to secure jobs for his friends at practices led by younger white male physicians.

41.     During the interview process, Risinger was rude and condescending towards Dr. Abraham and Dr. G. Indeed, during his interview, Risinger facetiously commented that he would "be a nice boss" to Dr. Abraham and Dr. G.

42.     As such, they told Benson they would like to interview other candidates, which noticeably upset Benson and caused him to lash out at Dr. Abraham and Dr. G.

### *Dr. Abraham's Complaints Regarding Benson and Patient Safety*

43.     Shortly thereafter, Dr. Abraham reported Benson to HCA's Human Resources for trying to circumvent the hiring process to hire his friend who had no experience.

44.     HCA's Human Resources never followed up with Dr. Abraham and only later, upon Dr. Abraham's request, vaguely stated they "took care" of the situation but refused to disclose what steps (if any) were taken, and Benson remained the Market Manager where he could continue to interfere with Dr. Abraham's ability to serve her patients.

45.     After Dr. Abraham's initial complaint, Benson's behavior escalated, and between September and October 2020, Dr. G, Dr. Abraham's medical assistant Kay McNealy, and Dr. G's LPN all resigned or submitted their resignations causing serious staffing issues.

46.     Dr. G submitted his resignation following a contentious meeting with Benson regarding the hiring of a Practice Manager and the interview with Risinger.

47.     On October 23, 2020, Benson and Dr. Abraham met about Dr. Abraham's concerns.

48.     During that conversation, Benson told Dr. Abraham that she would need to hire a "less than ideal" candidate as her medical assistant, ignored her comments about not having time to train a whole new clinical team given the ongoing staffing problems created by Benson's actions, and indicated that he had never transitioned the practice of a 10+ year doctor to another doctor before, nor did he have any plan in place for doing so.

49.     During the conversation, Dr. Abraham told Benson that his transition plan would not work, as she was already at full capacity and could not safely manage Dr. G's entire patient load, as well.

50.     After this meeting, in which Dr. Abraham explained her concerns about the practice's patient safety practices, Benson never returned to the practice and increased his retaliatory and discriminatory response to Dr. Abraham's reasonable, lawful requests.

51.     Benson did not require practices led by younger white male physicians to hire "less than ideal" medical assistants.

52.     Frustrated with Benson's response to her complaints, on October 27, 2020, Dr. Abraham e-mailed Benson, HCA's Human Resources, and several HCA Vice Presidents explaining that to safely treat its patients, OPEDC needed additional clinical help.

53.     In her email, Dr. Abraham raised concerns over losing 50% of OPEDC's staff in the prior two months. She also detailed the meeting that she had with Benson on October 23, 2020, in which he mocked her desire to hire experienced clinical staff, ignored her complaints about the effect having limited and untrained staff would have on patient safety, and detailed false comments Benson had made about her. At the end of that email, Dr. Abraham asked for an opinion from HCA's legal counsel regarding the ethics and legal issues presented by forcing Dr. Abraham to serve patients with insufficient and undertrained staff, as well as any legal issues raised by forcing

8

Dr. Abraham to assume Dr. G's patients despite already serving a full patient load. Finally, Dr. Abraham detailed that lack of a proper transition plan could lead to claims of patient abandonment and questioned whether Benson was intentionally creating a "toxic environment" to force Dr. Abraham to terminate her employment.

54.     Despite her complaints, Defendants did nothing, so on October 30, 2020, Dr. Abraham met with Daniel Sykes (HCA's Regional Vice President over the OPEDC practice) to discuss her concerns and the transition plan with Dr. G leaving.

55.     Dr. Abraham again expressed her concern about not having another doctor in the practice and the patient safety concerns related to the practice's lack of adequate and experienced clinical staff. Specifically, she requested support from Defendants to keep OPEDC open, including but not limited to providing sufficient clinical staff, and indicated that she would not jeopardize patient safety due to a lack of support from Defendants.

56.     During this conversation, Dr. Abraham told Sykes that she wanted to stay at OPEDC after building and maintaining a strong and profitable specialty practice, and considering the limited number of Endocrinologists in the area. But Dr. Abraham was adamant that Defendants' refusal to provide adequate staffing at the practice was jeopardizing patient safety.

57.     Dr. Abraham also asked Sykes to investigate Benson's behavior, which had resulted in half of OPEDC's staff leaving over the course of the prior few months.

58.     Additionally, Dr. Abraham expressed disappointment that HCA refused to reach out to one of her endocrinologist colleagues who was working for another hospital and was available and interested in joining the practice.

59.     Finally, Dr. Abraham raised concerns that Defendants were intentionally sabotaging the practice to force her to terminate her employment and requested that Defendants provide an adequate transition plan for Dr. G's patients.

60.     During a subsequent meeting with Andrew Hare (HCA's Assistant Vice President of the Physician Services Group), when Dr. Abraham expressed her frustration with the lack of support from HCA, Hare told her "there are other options in the contract"—implying that Defendants wanted her to quit.

61.     Upon information and belief, Defendants do not suggest to younger white male physicians that they should consider resigning in response to a legitimate, good-faith complaint.

62.     Upon information and belief, Defendants never investigated Dr. Abraham's complaints about Benson.

63.     On December 3, 2020, Dr. Abraham sent an e-mail to HCA leadership stating again that the practice had no clinical staff and describing the situation as a "crisis."

64.     But again, nothing was done, and shortly thereafter, Dr. Abraham was informed by HCA executives, over her objections, that the practice would move forward with only one physician.

65.     Later that month, OPEDC's final nurse retired, leaving the practice with no clinical staff.

66.     From that point forward, Defendants refused to replace any staff members, and Dr. Abraham was forced to perform tasks that would normally be performed by clinical staff, such as bringing patients to their room and taking their vitals—limiting Dr. Abraham's ability to treat her patients safely, effectively, and efficiently.

67.     Upon information and belief, Defendants do not require younger white male physicians to bring patients to their room and take their vitals.

### *Dr. Abraham's Constructive Discharge and Post-Discharge Communications*

68.     On January 4, 2021, after exhausting all available options to resolve the staffing and patient safety issues, Dr. Abraham submitted her letter of resignation, as she no longer believed she could safely, ethically, and adequately care for her patients due to Defendants' refusal to appropriately staff the practice.

69.     Dr. Abraham's last day working for Defendants was April 3, 2021.

70.     Upon information and belief, Defendants did not impose the same conditions on practices led by younger white male physicians, nor did they ignore good-faith complaints made by younger white male physicians at other practices owned and operated by Defendants.

71.     Indeed, upon information and belief, and despite Dr. Abraham maintaining a strong and profitable practice for 12 years, Defendants actions at all times material were motivated by Dr. Abraham's gender, race, national origin, and age, as well as her good-faith complaints about patient safety.

72.     Following her departure, Dr. Abraham, through counsel, sent Sykes a confidential settlement demand and request to preserve potentially relevant materials.

73.     Despite being obligated under Section 11.E of Dr. Abraham's Employment Agreement to attempt to amicably resolve any disagreements through discussions with each other, Defendants never substantively responded to Dr. Abraham's letter, nor did they ever confirm that they preserved any potentially relevant materials, as requested.

74.     Thereafter, on August 15, 2022, Dr. Abraham, through counsel, sent Sykes and Michael McAlevey (HCA's Senior Vice President and Chief Legal Officer) another settlement

demand, reminding Defendants of their obligation to attempt to resolve any disagreements through discussions with each other and again requesting confirmation that Defendants preserved any potentially relevant evidence related to Dr. Abraham's employment.

75.     But again, Defendants never substantively responded to Dr. Abraham's August 15, 2022 correspondence, nor have they confirmed that they preserved any potentially relevant evidence, necessitating the initiation of this lawsuit.

## Count I – Breach of Contract

76.     Dr. Abraham incorporates the allegations set forth in the Paragraphs above as if fully set forth herein.

77.     Dr. Abraham and Defendants entered into an Employment Agreement in November 2019, which is valid, enforceable, and supported by sufficient consideration.

78.     Dr. Abraham fully performed, or stood willing to perform, all of her duties and obligations under the Agreement.

79.     Defendants have breached and continue to breach the Agreement, including the clinical matters, termination, and dispute resolution provisions therein.

80.     Defendants' actions have caused and will continue to cause damages to Dr. Abraham, for breach of contract in an amount in excess of $75,000.

WHEREFORE, Dr. Abraham prays for judgment against Defendants on Count I of this Complaint, for a finding that Defendants breached the terms of her Employment Agreement; for actual and compensatory damages in an amount yet to be determined but in excess of $75,000; for all costs, expenses, and attorneys' fees incurred by Dr. Abraham in bringing this action; for pre- and post-judgment interest; and for such other relief as the Court deems just and equitable.

## Count II – Breach of the Duty of Good Faith and Fair Dealing

81.     Dr. Abraham incorporates the allegations set forth in the Paragraphs above as if fully set forth herein.

82.     Defendants are subject to an implied duty of good faith and fair dealing to refrain from doing anything that would have the effect of destroying or injuring Dr. Abraham's right to receive the benefits of her Employment Agreement.

83.     Defendants violated the implied duty of good faith and fair dealing by failing to provide Dr. Abraham with adequate levels of clinical staff to safely treat her patients.

84.     Defendants violated Dr. Abraham's Employment Agreement by failing to abide by the good faith spirit of the Employment Agreement's provisions, forcing Dr. Abraham to resign her employment.

WHEREFORE, Dr. Abraham prays for judgment against Defendants on Count II of this Complaint, for a finding that Defendants breached the duty of good faith and fair dealing; for actual and compensatory damages in an amount yet to be determined but in excess of $75,000; for all costs, expenses, and attorneys' fees incurred by Dr. Abraham in bringing this action; for pre- and post-judgment interest; and for such other relief as the Court deems just and equitable.

## Count III – Retaliatory Discharge in Violation of Public Policy

85.     Dr. Abraham incorporates the allegations set forth in the Paragraphs above as if fully set forth herein.

86.     From 2009 through April 3, 2021, Dr. Abraham was employed by Defendants.

87.     From October 2020 through the end of Dr. Abraham's employment, Dr. Abraham reported violations of rules, regulations, and laws pertaining to public health, safety, and general welfare to her superiors and Defendants' management.

13

88.     Indeed, during that period of time, Dr. Abraham made repeated complaints about her ability to safely treat patients due to staffing issues necessitated by Defendants' refusal to provide OPEDC with appropriate levels of clinical staff.

89.     As such, on January 4, 2021, Dr. Abraham submitted her letter of resignation only after exhausting all available options to resolve the staffing and patient safety issues, as she no longer believed she could safely and adequately care for her patients due to Defendants' refusal to provide an appropriate level of clinical staff.

90.     A reasonable person would view the working conditions as intolerable.

91.     The reasons given by Defendants for failing to address the staffing and patient safety issues at OPEDC were pretextual and not the true reasons for Dr. Abraham's constructive discharge.

92.     Instead, Defendants constructively discharged Dr. Abraham from employment because Dr. Abraham frequently raised and documented complaints to Benson, Hare, Sykes, and other members of Defendants' leadership team and HCA's Human Resources about patient safety.

93.     As a direct and proximate result of Defendants' unlawful employment practices described herein, Dr. Abraham sustained damages in the form of lost salary and benefits, emotional pain, suffering, inconvenience, loss of enjoyment of life, and mental anguish.

WHEREFORE, Dr. Abraham prays for judgment against Defendants on Count III of this Complaint, for a finding that she was subjected to unlawful retaliation; for monetary losses, back pay, payment of wages owed, injunctive relief, declaratory judgment, equitable relief, compensatory damages, emotional distress damages, punitive damages, front pay, costs expended, pre-judgment and post-judgment interest, and for such other relief as the Court deems just and proper.

### Count IV – Gender Discrimination in Violation of Title VII and the KAAD

94.    Dr. Abraham incorporates the allegations set forth in the Paragraphs above as if fully set forth herein.

95.    Dr. Abraham is female and brings these claims pursuant to Title VII and the KAAD.

96.    Dr. Abraham was qualified to perform the essential functions of her position.

97.    Dr. Abraham was treated differently than similarly situated male colleagues at other practices owned and operated by Defendants.

98.    Defendants deliberately made Dr. Abraham's working conditions so intolerable that she had no choice but to quit.

99.    A reasonable person would view the working conditions as intolerable.

100.    Dr. Abraham's gender was a motivating factor in the Defendants' decision not to provide adequate levels of clinical staff and to constructively discharge Dr. Abraham's employment.

101.    Dr. Abraham's gender is the reason that Defendants did not provide adequate levels of clinical staff and constructively discharged Dr. Abraham's employment.

102.    Defendants' conduct adversely affected the terms, conditions, and privileges of Dr. Abraham's employment.

103.    Defendants' intentional, unlawful, and discriminatory treatment of Dr. Abraham violates Title VII and the KAAD and was willful, voluntary, intentional, and done knowingly within the meaning of Title VII and the KAAD, justifying an award of, among other things, lost wages and benefits, compensatory damages, court costs, litigation expenses, and attorneys' fees.

104.    Defendants acted with malice or reckless indifference to Dr. Abraham's rights under Title VII and the KAAD, entitling her to punitive damages as well.

WHEREFORE, Dr. Abraham prays for judgment against Defendants on Count IV of this Complaint, for a finding that she was subjected to unlawful discrimination; for monetary losses, back pay, payment of wages owed, injunctive relief, declaratory judgment, equitable relief, compensatory damages, emotional distress damages, punitive damages, front pay, costs expended, attorney and expert fees, pre-judgment and post-judgment interest, for all other relief under Title VII and the KAAD, and for such other relief as the Court deems just and proper.

**Count V – Race Discrimination in Violation of Title VII, the KAAD, and 42 U.S.C. § 1981**

105.    Dr. Abraham incorporates the allegations set forth in the Paragraphs above as if fully set forth herein.

106.    Dr. Abraham is Indian and brings these claims pursuant to Title VII, the KAAD, and 42 U.S.C. § 1981.

107.    Dr. Abraham was qualified to perform the essential functions of her job.

108.    Dr. Abraham was treated differently than similarly situated white colleagues at other practices owned and operated by Defendants.

109.    Defendants deliberately made Dr. Abraham's working conditions so intolerable that she had no choice but to quit.

110.    A reasonable person would view the working conditions as intolerable.

111.    Dr. Abraham's race was a motivating factor in Defendants' decision not to provide adequate levels of clinical staff and to constructively discharge Dr. Abraham's employment.

112.    Dr. Abraham's race is the reason Defendants did not provide adequate levels of clinical staff and constructively discharged Dr. Abraham's employment.

113.    Defendants' conduct adversely affected the terms, conditions, and privileges of Dr. Abraham's employment.

114.    Defendants' intentional, unlawful, and discriminatory treatment of Dr. Abraham violates Title VII, the KAAD, and 42 U.S.C. § 1981 and was willful, voluntary, intentional, and done knowingly within the meaning of Title VII, the KAAD, and 42 U.S.C. § 1981, justifying an award of, among other things, lost wages and benefits, compensatory damages, court costs, litigation expenses, and attorneys' fees.

115.    Defendants acted with malice or reckless indifference to Dr. Abraham's rights under Title VII, the KAAD, and 42 U.S.C. § 1981, entitling her to punitive damages as well.

WHEREFORE, Dr. Abraham prays for judgment against Defendants on Count V of this Complaint, for a finding that she was subjected to unlawful discrimination; for monetary losses, back pay, payment of wages owed, injunctive relief, declaratory judgment, equitable relief, compensatory damages, emotional distress damages, punitive damages, front pay, costs expended, attorney and expert fees, pre-judgment and post-judgment interest, for all other relief under Title VII, the KAAD, and 42 U.S.C. § 1981, and for such other relief as the Court deems just and proper.

**Count VI – National Original Discrimination in Violation of Title VII and the KAAD**

116.    Dr. Abraham incorporates the allegations set forth in the Paragraphs above as if fully set forth herein.

117.    Dr. Abraham is of Indian descent and brings these claims pursuant to Title VII and the KAAD.

118.    Dr. Abraham was qualified to perform the essential functions of her job.

119.    Dr. Abraham was treated differently than similarly situated Caucasian colleagues at other practices owned and operated by Defendants.

120.    Defendants deliberately made Dr. Abraham's working conditions so intolerable that she had no other choice but to quit.

17

121.    A reasonable person would view the working conditions as intolerable.

122.    Dr. Abraham's national origin was a motivating factor in Defendants' decision not to provide adequate levels of clinical staff and to constructively discharge Dr. Abraham's employment.

123.    Dr. Abraham's national origin is the reason Defendants did not provide adequate levels of clinical staff and constructively discharged Dr. Abraham's employment.

124.    Defendants' conduct adversely affected the terms, conditions, and privileges of Dr. Abraham's employment.

125.    Defendants' intentional, unlawful, and discriminatory treatment of Dr. Abraham violates Title VII and the KAAD, and was willful, voluntary, intentional, and done knowingly within the meaning of Title VII and the KAAD, justifying an award of, among other things, lost wages and benefits, compensatory damages, court costs, litigation expenses, and attorneys' fees.

126.    Defendants acted with malice or reckless indifference to Dr. Abraham's rights under Title VII and the KAAD, entitling her to punitive damages as well.

WHEREFORE, Dr. Abraham prays for judgment against Defendants on Count VI of this Complaint, for a finding that she was subjected to unlawful discrimination; for monetary losses, back pay, payment of wages owed, injunctive relief, declaratory judgment, equitable relief, compensatory damages, emotional distress damages, punitive damages, front pay, costs expended, attorney and expert fees, pre-judgment and post-judgment interest, for all other relief under Title VII and the KAAD, and for such other relief as the Court deems just and proper.

**Count VII – Age Discrimination in Violation of the ADEA and KADEA**

127.    Dr. Abraham incorporates the allegations set forth in the Paragraphs above as if fully set forth herein.

18

128.    Dr. Abraham is a qualified individual over the age of 40.

129.    Dr. Abraham was qualified to perform the essential functions of her job.

130.    Dr. Abraham was treated differently than similarly situated younger colleagues at other practices owned and operated by Defendants.

131.    Defendants deliberately made Dr. Abraham's working conditions so intolerable that she had no other choice but to quit.

132.    A reasonable person would view the working conditions as intolerable.

133.    Dr. Abraham's age was a motivating factor in Defendants' decision to not provide adequate levels of clinical staff and to constructively discharge Dr. Abraham's employment.

134.    Dr. Abraham's age is the reason Defendants did not provide adequate levels of clinical staff and constructively discharged Dr. Abraham's employment.

135.    Defendants' conduct adversely affected the terms, conditions, and privileges of Dr. Abraham's employment.

136.    Defendants were aware of the ADEA's prohibition of age discrimination such that Defendants' conduct was willful, entitling Dr. Abraham to an award of liquidated damages.

137.    Defendants' conduct was outrageous, intentional, willful, or shows evil motive or reckless indifference or conscious disregard for Dr. Abraham's rights and the rights of others; therefore, Defendants are liable for liquidated damages.

138.    Defendants, through their agents and employees, engaged in discriminatory practices with malice or reckless indifference to Dr. Abraham's federally protected rights. Defendants are therefore liable for all damages available under the ADEA and KADEA.

WHEREFORE, Dr. Abraham prays for judgment against Defendants on Count VII of this Complaint, for a finding that she was subjected to unlawful discrimination; for monetary losses,

back pay, payment of wages owed, injunctive relief, declaratory judgment, liquidated damages, equitable relief, front pay, costs expended, attorney and expert fees, pre-judgment and post-judgment interest, for all other relief under the ADEA and KADEA that is available or may become available, including compensatory, emotional distress, and punitive damages, and for such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Dr. Abraham requests a jury trial on all claims and issues as allowed by law.

Respectfully submitted by,

FOULSTON SIEFKIN LLP

By: */s/ Tara Eberline*
Tara Eberline, KS Bar No. 22576
Travis D. Hanson, KS Bar No. 27643
7500 College Boulevard, Suite 1400
Overland Park, KS 66210
Tel. 913-253-2136
Fax. 913-498-2101
teberline@foulston.com
thanson@foulston.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

*/s/ Tara Eberline*
Tara Eberline, KS Bar No. 22576